**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CENTRAL CONTRACTING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KENNY CONSTRUCTION COMPANY | ) | |
| and TRANS-ALLEGHENY | ) | |
| INTERSTATE LINE COMPANY, | ) | |
| | ) | |
| Defendants. | ) | No. 11 C 9175 |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | | |
| KENNY CONSTRUCTION COMPANY, | ) | Judge Jorge L. Alonso |
| | ) | |
| Counterplaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CENTRAL CONTRACTING, INC., | ) | |
| | ) | |
| Counterdefendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court are the parties' cross-motions for partial summary judgment. For the reasons explained below, the motion of plaintiff/counterdefendant, Central Contracting, Inc. ("Central"), for partial summary judgment [88] is denied, and the motion of defendant/counterplaintiff Kenny Construction Company ("Kenny") for partial summary judgment [78] is granted.

## BACKGROUND

Central filed its complaint and amended complaint in September 2011 against Kenny and defendant Trans-Allegheny Interstate Line Company ("TrailCo") in the Circuit Court of

Monongalia County, West Virginia, asserting claims for breach of contract, enforcement of mechanic's lien, and unjust enrichment. On October 7, 2011, defendants removed the case to the United States District Court for the Northern District of West Virginia, alleging diversity jurisdiction. On December 23, 2011, the district court granted in part defendants' motion to transfer the case to this district, severing Counts I and III (breach of contract and unjust enrichment) and transferring them to this district.[1] Upon transfer, the case was assigned to the Honorable Amy J. St. Eve. Defendants answered the amended complaint, and Kenny filed a counterclaim asserting claims for declaratory judgment (Count I), breach of contract (Count II), unjust enrichment (Count III), and an accounting (Count IV). The case was later reassigned to the Honorable John Z. Lee and recently reassigned to this Court.

In February 2012, Kenny moved for partial summary judgment. In response, Central invoked Federal Rule of Civil Procedure 56(d) and argued that it was unable to respond to Kenny's motion without discovery. Judge St. Eve entered an order denying Kenny's motion without prejudice and granting Central's Rule 56(d) request for discovery. In that order, the court described the basic facts as follows:

> This dispute arises out of a Subcontract Agreement ("Subcontract") into which Central and Kenny entered on September 22, 2007. The Subcontract was in furtherance of a contract between Kenny and TrailCo . . . . Pursuant to the Subcontract, [Central] performed access road construction services in connection with the Trans-Allegheny Interstate Line Company 500kV Transmission Project. Central alleges that Kenny breached the Subcontract by failing and refusing to

---

[1] The District Court in West Virginia retained jurisdiction over Count II, the claim for enforcement of a mechanic's lien, and stayed it until the conclusion of the instant portion of the action. The parties' Subcontract provides that the state and federal courts in Chicago, Illinois "shall be the exclusive forums for resolving all disputes with respect to" the contract, "other than disputes related to mechanic's liens, which shall be resolved in the State or Federal Courts having jurisdiction over the Work." (R. 79-1, Agreed Local Rule ("L.R.") 56.1 Stmt., Ex. A, Subcontract, at 10 ¶ 6.10.)

pay $5,723,852.80 that Kenny owed Central under the Subcontract. Further, Central alleges that TrailCo was unjustly enriched by Central's improvement of TrailCo's property.

In its Counterclaim, Kenny alleges that payment under the Subcontract was based upon the time and equipment expenses of the work plus a fee for the expenses Central incurred on the project. Because many of Central's workers had to travel away from their homes during the project, the Subcontract provided that Kenny would pay Central the necessary per diem expenses incurred by the project workers. . . . Kenny asserts that during a financial audit of Central, it discovered that it had paid $4,910,056.00 to Central in per diem expenses, but Central passed along only $1,501,790 to its employees.

*Cent. Contracting, Inc. v. Kenny Constr. Co.*, No. 11 C 9175, R. 43, 2012 WL 832842, at *1-2 (N.D. Ill. Mar. 12, 2012) (citations omitted). "Kenny also allegedly discovered an irregularity with respect to labor rates during the financial audit--namely, that Central charged Kenny for increased labor rates but did not pass those increases along to its workers. Kenny asserts that it overpaid $923,572.00 relating to increased labor costs." *Id.* at *2 n.4 (citation omitted).

All discovery has been completed. Kenny has filed a motion for partial summary judgment on Counts I and III (breach of contract and unjust enrichment) of Central's amended complaint and on Counts I-III of Kenny's counterclaim (declaratory judgment, breach of contract, and unjust enrichment), on the issue of whether Central was entitled under the Subcontract to *per diem* payments.[2] Central has filed a motion for partial summary judgment on the same issue, as to the same claims as well as Count IV of Kenny's counterclaim (which seeks an accounting), and on the additional issue of whether Central was entitled to payments based on increased wage rates for field laborers.

---

[2]Kenny states that "[r]esolution of the *per diem* issue would not resolve the entire case against Kenny, or Kenny's counterclaim against Central, in its entirety." (R. 81, Kenny's Mem. in Supp. of Mot. for Summ. J. at 7 n.1.)

# DISCUSSION

## A.    Legal Standards

### 1.    Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In considering such a motion, the Court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party.  *See Kvapil v. Chippewa Cnty., Wis.*, 752 F.3d 708, 712 (7th Cir. 2014).  "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Talanda v. KFC Nat'l Mgmt. Co.*, 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014).  The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013).

### 2.    Contract Interpretation

Paragraph 6.10 of the Subcontract provides, and the parties[3] agree, that it is to be construed under Illinois law.  (R. 79-1, Agreed L.R. 56.1 Stmt., Ex. A, Subcontract, at 10 ¶ 6.10.)  To establish a breach of contract under Illinois law, a party must show "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *nClosures Inc. v. Block & Co.*, 770 F.3d 598, 601

---

[3]In this opinion, the Court uses the term "parties" to refer to Kenny and Central only. TrailCo is a party to this action but is not involved in the instant motions.

(7th Cir. 2014); *see also W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004). The parties' claims present questions of contract interpretation, the basic rules of which are well settled. In Illinois, the determination of whether a contract is ambiguous, as well as the construction of an unambiguous contract, are questions of law. *See Gallagher v. Lenart*, 874 N.E.2d 43, 50 (Ill. 2007); *Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 214 (Ill. 2004). "The primary objective in construing a contract is to give effect to the intent of the parties." *Gallagher*, 874 N.E.2d at 58. Illinois courts interpret contracts according to the "four corners" rule, which requires that "'an agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence.'" *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999) (brackets omitted) (quoting *W. Ill. Oil Co. v. Thompson*, 186 N.E.2d 285, 291 (Ill. 1962)). In applying this rule, "[a] court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent." *Gallagher*, 874 N.E.2d at 58. "[B]ecause words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others. The intent of the parties is not to be gathered from detached portions of a contract or from any clause or provision standing by itself. " *Id.* (citation omitted).

If the words in a contract are clear and unambiguous, "they must be given their plain, ordinary and popular meaning." *Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011); *see also Utility Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 687 (7th Cir. 2004) (citing *Trade Ctr. v. Dominick's Finer Foods*, 711 N.E.2d 333, 335 (Ill. App. Ct. 1999)) ("Under Illinois law, . . . contract terms are interpreted according to their plain meaning unless otherwise defined."). If

a contract is unambiguous, "the court will enforce it as written, without resorting to extrinsic evidence." *Curia v. Nelson*, 587 F.3d 824, 829 (7th Cir. 2009) (citing *Farm Credit Bank v. Whitlock*, 581 N.E.2d 664, 667 (Ill. 1991)).  Interpretation of the terms of an unambiguous contract is a question particularly suited to disposition on summary judgment.  *Kallman v. Radioshack Corp.*, 315 F.3d 731, 735 (7th Cir. 2002).  If the language of a contract is reasonably susceptible to more than one meaning, however, it is ambiguous.  "In that case, a court may consider extrinsic evidence to ascertain the parties' intent." *Gallagher*, 874 N.E.2d at 58.

"Language in a contract is not ambiguous merely because the parties disagree as to its interpretation." *Vill. of Arlington Heights v. Anderson*, 963 N.E.2d 949, 956 (Ill. App. Ct. 2011).  A contract is not necessarily unambiguous when each party insists that the language unambiguously supports its position, and a contract is not necessarily ambiguous merely because the parties disagree on its meaning. *Cent. Ill. Light*, 821 N.E.2d at 214.

**B.** **Facts**

The following relevant facts are undisputed except where noted.[4]  The parties entered into the Subcontract on September 22, 2007.  (R. 79-1, Agreed L.R. 56.1 Stmt., Ex. A.)  Pursuant to the Subcontract, Central agreed to perform access road construction services in

---

[4]Central argues that there are five statements in its Rule 56.1 Statement of Facts that the Court should deem admitted because Kenny has improperly responded to them.  (R. 112, Central's Reply in Supp. of Mot. for Summ. J. at 2.)  The Court denies the request as moot as to Statements 10, 54, and 55 because those statements are irrelevant to the analysis.  The Court denies the request as to Statement 58 because the statement is not supported by Exhibit N and because it is irrelevant to the analysis.  Statement 38 is addressed below at note 6.

connection with the TrailCo's 500kV Transmission Project (the "Project"), and Kenny agreed to pay Central for this work. Central began its work on the Project sometime in 2008.[5]

The Subcontract, which is discussed in greater detail below, provides that Kenny will pay Central for the "Cost of the Work" plus a Subcontractor's Fee. The "Cost of the Work" includes several enumerated items, including *per diem* payments for Central's non-local employees' food and lodging. The primary dispute between the parties relates to these *per diem* payments. According to Central's president and owner, John Steven Cvechko (to whom the parties refer as "Steve Cvechko"), Central has always had an unwritten policy of not paying field laborers *per diem* allowances; instead, Central directly pays for their lodging expenses and "some gasoline on occasion." (R. 89, Central's L.R. 56.1 Stmt. ¶ 38;[6] R. 79-7, Agreed L.R. 56.1 Stmt., Ex. F, Dep. of Steve Cvechko 56, 68-70.) It is undisputed that Central did not pay its employees the same amount that Kenny paid Central for *per diems.*[7]

---

[5]It is difficult to tell from the parties' submissions exactly when in 2008 Central began its work. In any event, this fact is relevant to the instant motions only for narrative purposes.

[6]Central requests that the Court deem admitted its Statement 38, which states in pertinent part that "Central has never paid *per diem* to its field workers on any project; instead, Central directly pays for hotels and some gasoline for the field workers . . . ." (R.112, Central's Reply in Supp. of Mot. for Summ. J. at 2; R. 89, Central's L.R. 56.1 Stmt. ¶ 38.) It contends that Kenny's response-- that evidence regarding Central's "other jobs" is irrelevant--is improper. The Court deems the statement admitted. It is relevant to the fundamental issue of whether Central incurred costs for *per diem* payments.

[7]It is difficult for the Court to determine the exact amount at issue with respect to *per diems* because Central does not properly respond to the following statement by Kenny: "Central passed along $1,501,790 in *per diem* expense[] to its employees, keeping the $3,442,128 difference between what it paid the employees for this item and what Kenny paid Central for it." (R. 108, Central's L.R. 56.1 Resp. to Kenny's L.R. 56.1 Stmt. ¶ 7.) Central denies this statement without explanation, but the material it cites in support of its denial does not address all of the aspects of the statement, in particular the exact figures. The Court nonetheless declines to deem the statement admitted in light of the fact that the thrust of the instant motions is the broad issue of Kenny's liability for the *per diems*. The parties have not adequately briefed any damages calculations.

In February 2009, certain of the parties' representatives held a meeting by mutual agreement in order to "tie up any loose ends and make sure both companies were on the same page moving forward with the Project." (R. 89, Central's L.R. 56.1 Stmt. ¶ 42.) Attending the meeting were James Buckner and Richard Catron for Kenny, and Steve Cvechko, Steven Brent ("Brent") Cvechko, Troy Sampson, Rick Haveron, and Timothy Aliff for Central. (*Id.* ¶ 43.) The representatives discussed recordkeeping for *per diem* payments. Buckner stated that TrailCo did not want Central to include the notation "spent the night" on its daily production reports for non-local employees who had required lodging.[8] (*Id.* ¶ 47*;* R. 79-7, Agreed L.R. 56.1 Stmt., Ex. F, Steve Cvechko Dep. 67.) Steve Cvechko explained that Central made the notation because it was not incurring *per diem* expenses for local workers or workers who did not need lodging.[9] (R. 89, Central's L.R. 56.1 Stmt. ¶ 48; R. 79-7, Agreed L.R. 56.1 Stmt., Ex. F, Steve Cvechko Dep. 71.) The representatives had further discussion about how Central should invoice for *per diem* expenses; the details of those discussions are set forth below in connection with Central's estoppel argument.

---

[8]Kenny responds in part: "Kenny admits that the statement about TrailCo not wanting the 'spen[t] the night' notation on production invoices was made." (R. 104, Kenny's Resp. to Central's L.R. 56.1 Stmt. ¶ 47.) Kenny does not elaborate. This response does not address the assertion that Buckner made the statement. The testimony of Steve Cvechko supports the statement, so the Court deems it admitted. *See* L.R. 56.1(b)(3)(C).

Buckner testified that although he is sure he met with Central to discuss "all aspects of" the Subcontract, he does not specifically recall the February 2009 meeting. (R. 97-3, Central's L.R. 56.1 Stmt., Ex. U, Dep. of James Patrick Buckner 14.)

[9]Kenny responds: "Kenny admits that the statement about Cvechko's position on the [] 'spen[t] the night' notation on production invoices was made." (R. 104, Kenny's Resp. to Central's L.R. 56.1 Stmt. ¶ 48.) Kenny does not elaborate. This response does not address the assertion that Cvechko made the statement. The testimony of Steve Cvechko supports the statement, so the Court deems it admitted. *See* L.R. 56.1(b)(3)(C).

On the anniversary of the Subcontract in September 2008, Central sought a increase in payments based on a four percent wage increase for its field laborers. (R. 104, Kenny's Resp. to Central's L.R. 56.1 Stmt. ¶ 23.) Effective October 1, 2008, Kenny approved and Central was given this increase. (*Id.* ¶ 24.) This increase was the only increase in payments for field-labor wages that Central requested on the Project. (*Id.* ¶ 25.)

While the Project was ongoing, Richard Catron, Kenny's Cost Control Specialist, reviewed all of Central's invoices to verify hours worked and *per diem* rates billed. (R. 89, Central's L.R. 56.1 Stmt. ¶¶ 64-65; Ex. N-1, Dep. of Richard Catron at 7, 31, 38.) TrailCo also reviewed Central's invoices and occasionally advised Kenny about changes that needed to be made before TrailCo would pay. (R. 89, Central's L.R. 56.1 Stmt. ¶ 70.) When the Project was near completion in April 2011, Kenny audited Central's records of field laborers' work. (R. 113, Central's Reply to Kenny's L.R. 56.1 Resp. ¶ 1.) During the final audit, Kenny informed Central that the *per diem* billings were improper and asked to be reimbursed. (R. 79, Agreed L.R. 56.1 Stmt. ¶ 11.) Kenny instructed Central to stop submitting invoices for *per diem* payments; Central did so, but continued to record its claimed *per diem* charges. (R. 89, Central's L.R. 56.1 Stmt. ¶¶ 72-73.) Kenny also asserted that Central did not qualify for the four percent increase in payments for field-labor wages that it had received in 2008. (R. 104, Kenny's Resp. to Central's L.R. 56.1 Stmt. ¶ 30.)[10] At some point in 2011, Kenny stopped paying Central's invoices entirely. (*Id.* ¶ 74.) The parties then mutually terminated the Subcontract, effective June 10, 2011. (*Id.* ¶ 78.)

---

[10]In July 2009, Robert Strong, Kenny's Chief Financial Officer, had begun a labor-rate justification review of all of Kenny's subcontractors' labor rates, including Central's. (R. 104, Kenny's Resp. to Central's L.R. 56.1 Stmt. ¶ 29.)

Central claims that Kenny owes it $2,983,752.63 for invoices submitted in March, April, May, and June 2011, as well as $178,103.00 in *per diem* payments. (R. 89, Central's L.R. 56.1 Stmt. ¶¶ 75-76.)[11] Kenny claims that Central should reimburse it for $3,442,128.00 in *per diem* payments that Central did not incur. (R. 80, Kenny's L.R. 56.1 Stmt. ¶ 7.) Kenny also claims that Central should reimburse it for $894,327.00 in wage increases for field laborers and $29,245.00 in wage increases for other employees. (R. 28, Countercl. ¶ 20.)

## C. *Per Diem* Payments

The parties have filed cross-motions on the issue of whether Central was entitled to *per diem* payments from Kenny under the Subcontract. Because the motions present the same issue, the Court will discuss the arguments presented in the cross-motions together. The Court is mindful that on cross-motions for summary judgment, the Court must view all facts and draw all reasonable inferences therefrom in the light most favorable to the party against whom the motion is made. *Deich-Keibler v. Bank One*, 243 F. App'x 164, 167 (7th Cir. 2007).

Each party contends that the plain language of the Subcontract unambiguously supports its position. Kenny's reasoning is as follows. The Subcontract provides that Kenny would pay Central for the "Cost of the Work" plus the Subcontractor's Fee for items on which the markup is allowed. (R. 79-1, Agreed L.R. 56.1 Stmt., Ex. A, Subcontract at 8 ¶ 6.1.) The "Cost of the Work" is defined on Exhibit B-1 to the Subcontract as "costs necessarily incurred by the Subcontractor in the proper performance of the Work," inclusive of the items listed therein. *Per diem* payments that Central did not pass on to its employees cannot be included as the "Cost of

---

[11]In the Amended Complaint, Central alleges that Kenny owes it a total of $5,723,852.80 under the Subcontract. (R. 3-1, Am. Compl. ¶ 15.)

the Work" because they were never "incurred"; therefore, Central is not entitled to those payments. Kenny also asserts that Central's conduct in keeping the *per diem* payments violates public policy "and should not be rewarded." (R. 81, Kenny's Mem. in Supp. of Mot. for Summ. J. at 12-15.)

Central contends that the work it performed on the Project "was requisitioned through Kenny's purchase orders," some of which stated that Central's work was "'to be performed on a T[ime] and M[aterial] Basis per the rates established in the above Master Agreement.'"[12] (R. 90, Central's Mem. in Supp. of Mot. for Summ. J. at 4-5; R. 94-1, Central's L.R. 56.1 Stmt., Ex. L.) Those rates, according to Central, "are contained in schedules included as Exhibits B-1.1, B-1.2, and B-1.3 to the Subcontract," and Exhibit B-1.1, which contains the wage rates for field labor, "expressly includes payment of a per diem allowance." (R. 90, Central's Mem. in Supp. of Mot. for Summ. J. at 5.) Because Note 2 to Exhibit B-1.1 states that *per diem* "shall be paid in accordance with IRS Publication 1542, Per Diem," Central maintains that Kenny's purchase orders therefore "mandated payment of a per diem allowance to Central as part of the time and materials rates agreed to on Exhibit B-1.1." (*Id.*)

The Court agrees with the parties that the Subcontract is unambiguous on the *per diem* issue, but it does not agree with either party's interpretation. Our analysis begins with the payment provision in Article 6 of the Subcontract, which states in relevant part as follows:

> For the faithful performance of the Work and each and every of its obligations hereunder, as set forth in the applicable Purchase Order, [Kenny] will pay to [Central] the Cost of the Work plus Subcontractor's Fee (as hereinafter defined) (collectively, the "Contract Price"). Exhibit B-1, *Cost Plus Addendum*, sets forth the only items to be included in the Cost of the Work. Subcontractor's Fee shall

---

[12]The "Master Agreement" is the Subcontract.

be equal to ten percent (10%) of the Cost of the Work for those specific items for which a ten percent (10%) markup is allowed as set forth on Exhibit B-1. The Subcontractor's Fee is included in the field labor rates . . . set forth on Exhibit[] B-1.1 . . . .

(R. 79-1, Agreed L.R. 56.1 Stmt., Ex. A, Subcontract at 8 ¶ 6.1.)

The Cost-Plus Addendum to the Subcontract, Exhibit B-1, lists twenty-two categories of allowable costs and provides in relevant part as follows:

The term Cost of the Work shall mean costs necessarily incurred by the Subcontractor in the proper performance of the Work. Such costs shall be at rates not higher than the standard paid at the Project Real Property except with prior consent of the Contractor. The Cost of the Work shall include only the following items:
. . .
8. Per diem allowance for non-local travel of Subcontractor's employees as follows: (a) per diems for members of an organized bargaining unit shall be paid based on applicable union contracts; and (b) per diems for all other Subcontractor employees shall be the IRS allowable compensation for food and lodging for day or partial day spent in out-of-town office location, in accordance with IRS publication 1542, Per Diem Rates.

(*Id.*, Ex. B–1.)

The Subcontract clearly provides that Kenny would pay Central for the "Cost of the Work" (plus the Subcontractor's Fee, which is not at issue). "Cost of the Work" is defined as costs necessarily incurred by [Central] in the proper performance of the Work" and includes only the twenty-two items listed, including the cost of field labor and *per diem* allowances. Thus, to be payable, each item must constitute a cost "necessarily incurred" by Central.

Central cites the axiom that a contract must be interpreted as a whole, but pays it mere lip service. Central's interpretation of the Subcontract ignores the payment provision in Article 6 as well as the definition of "Cost of the Work" as "costs necessarily incurred by [Central] in the proper performance of the Work." Instead, Central myopically focuses on the field labor rate

schedule, Exhibit B-1.1 to the Cost-Plus Addendum, but fails to acknowledge that the exhibit is tied to an item included in and subject to the definition of "Cost of the Work" and therefore payable only if the item was a cost that Central "necessarily incurred." Central discounts the definition of "Cost of the Work" as being contained "in the introductory language to Exhibit B-1" (R. 105, Central's Mem. in Opp'n to Kenny's Mot. for Summ. J. at 7) and "in an addendum" (*Id.* at 2-3), but it does not dispute that the definition is part of the Subcontract (and an important part at that).[13]

The Court rejects Central's reliance on Kenny's purchase orders. The Subcontract states in pertinent part:

> This Agreement establishes the terms and conditions on which [Kenny] and [Central] may from time to time agree to Purchase Orders for Work (as defined below). The purchase of the Work by [Kenny] from [Central] is expressly governed by the terms and conditions contained or referred to herein. Any additional or different terms and conditions set forth in [Central]'s invoices, Purchase Orders, Purchase Order acknowledgments or in [Central]'s electronic data interchange acknowledgments, are objected to by [Kenny] and will not be binding upon [Kenny]. The provisions of this Agreement shall be modified only by a written amendment or Change Order executed by the Parties.

(R. 79-1, Agreed L.R. 56.1 Stmt., Ex. A, Subcontract at 1.) This language refutes Central's suggestion that the purchase orders, to the extent they can be read to contradict the payment and "Cost of the Work" provisions of the Subcontract, supersede those contract provisions.[14] Central argues that the only reasonable reading of the above-quoted provision is that it bars modification

---

[13]Central evidently does not feel constrained by its own logic; Central itself relies on an exhibit to that addendum.

[14]The purchase orders upon which Central relies do not appear to contradict the Subcontract. Moreover, they expressly state that they are governed by the Subcontract. (R. 94-1, Central's L.R. 56.1 Stmt., Ex. L.)

of the Subcontract only by Central's purchase orders, not Kenny's, but that argument contradicts the plain language of the provision.

In Central's view, whether it paid its employees *per diems* is "irrelevant" pursuant to the Fourth Circuit's decision in *United States v. Race*, 632 F.2d 1114 (4th Cir. 1980). (R. 90, Central's Mem. in Supp. of Mot. for Summ. J. at 7.) The defendants in *Race*, who owned an engineering firm, had been convicted of submitting to the Department of the Navy false invoices for payment of services and materials. Among the invoices were those for *per diem* payments at amounts greater than that which the firm had paid to its employees. The Court of Appeals held that the convictions could not be based on the *per diem* bills because the firm's contract with the Navy "very clearly authorized" such billing as a fixed amount, regardless of what the firm paid to its employees. 632 F.2d at 1118-19. *Race* is distinguishable because the applicable *per diem* provision stated simply that "Per Diem will be paid in accordance with the provisions of the Military Joint Travel Regulation . . . ." *Id.* at 1117. It was not subject to any overarching provision that limited the payments to those "necessarily incurred," as the contract states here.

Central devotes a significant portion of its briefs and factual statements to its argument that the Subcontract was a "time and materials" contract, as opposed to a "cost plus" contract, and that Kenny thus was obligated to make *per diem* payments regardless of whether Central incurred these costs. Central's characterization of the Subcontract as a "time and materials" contract is neither here nor there. The contract is unambiguous, so Kenny's contractual obligations are determined by the words of the contract. *See, e.g., Int'l Supply Co. v. Campbell*, 907 N.E.2d 478, 487 (Ill. App. Ct. 2009) (citing *Phillips v. O'Connell*, 61 N.E.2d 59, 63-64 (1945)) (stating that parties' contractual obligations must be determined from the contract terms

and that "[l]abeling a document or a promise a 'guaranty' does not automatically make it a guaranty under the law"). Central's argument is premised on a wholesale disregard of key contract terms.

Central also contends that the Court should apply the doctrine of "*contra proferentem*," pursuant to which ambiguous contract terms are construed against the drafter. *See, e.g., Premier Title Co. v. Donahue*, 765 N.E.2d 513, 517 (Ill. App. Ct. 2002). This rule, however, "is not an interpretive one at all. Instead of seeking to divine the intent of the parties, the rule merely assigns the risk of an unresolvable ambiguity to the party responsible for creating it." *Id.* Where, as here, the language of the operative contract is unambiguous, *contra proferentem* does not apply.

Kenny mentions repeatedly that Central failed to pass on the *per diem* payments to its employees, so Central makes a good point when it notes that the Subcontract defines "Cost of the Work" as "costs necessarily incurred," not "costs necessarily incurred *and paid*." (The parties could have used this kind of language; there are plenty of contracts that do.) The Court does not agree with Kenny that the phrase "'costs necessarily incurred' can only mean costs actually paid by Central." (R. 81, Kenny's Mem. in Supp. of Mot. for Summ. J. at 10 (emphasis omitted).) The plain and ordinary meaning of the word "incur" is "become liable or subject to." *In re Marriage of Magnuson*, 510 N.E.2d 437, 444 (Ill. App. Ct. 1987); *see also Chatham Corp. v. Dann Ins.*, 812 N.E.2d 483, 489 (Ill. App. Ct. 2004) ("'Incur' is a[] term that was not defined in the contract, but it has a plain, ordinary, and popular meaning of 'to become liable or subject to through one's own action; [to] bring or take upon oneself.'"); *Puritt v. Allstate Ins. Co.*, 672 N.E.2d 353, 356 (Ill. App. Ct. 1996) ("We have held that 'one incurs expenses when one

becomes liable for them.'"); *Hall v. Cook Cnty.*, 195 N.E. 54, 62 (Ill. 1935) ("The word 'incurred,' as used with reference to a debt, means 'become liable for.'"). Becoming liable for or subject to a debt or expense does not require one to have paid it. *Anest v. Audino*, 773 N.E.2d 202, 212 (Ill. App. Ct. 2002) (enforcing plaintiff's contractual entitlement to costs that had been incurred but not necessarily paid where the contract provided simply that plaintiff was entitled to costs "incurred" but did not say "incurred and paid," and finding that "the contractual language is clear and . . . whether Anest paid the fees is irrelevant."); *Am. Nat'l Bank & Trust Co. v. Steiner*, 603 N.E.2d 8, 11 (Ill. App. Ct. 1991) ("One incurs expenses when one becomes liable for them . . . and whether [a third party] paid the [plaintiff's] fees after it incurred them is irrelevant to whether it incurred them in the first place.") .

Ultimately, though, this analysis points to a resolution in Kenny's favor because in order to "incur" a cost, one still must become liable for it. The rulings on the instant motions would be very different if the undisputed evidence were that Central actually had incurred *per diem* costs and had not paid them, but there is no evidence that Central incurred such costs. The undisputed evidence that Central itself submits is that its "policy was not to pay per diem allowances" to its field laborers and even though it did not pay them *per diems*, the laborers "received exactly the wages and benefits for which they contracted." (R. 105, Central's Mem. in Opp'n to Kenny's Mot. for Summ. J. at 13; R. 109 & 109-10, Central's L.R. 56.1 Stmt. of Add'l Facts ¶ 16 & Ex. I, Aff. of Steve Cvechko ¶ 1a; R. 79-7, Agreed L.R. 56.1 Stmt., Ex. F, Steve Cvechko Dep. 44, 68, 70.) It is undisputed that Central never became liable to its field laborers for *per diem* payments; indeed, its policy was not to take such liability upon itself. Therefore, it did not "incur" these *per diem* costs as required to be payable by Kenny.

16

Central maintains that Kenny, "on account of its misrepresentations and conduct," is equitably estopped from denying Central's entitlement to the *per diem* payments and from seeking to recover the *per diem* payments already made. (R. 90, Central's Mem. in Supp. of Mot. for Summ. J. at 11.) "Equitable estoppel may be defined as the effect of the person's conduct whereby the person is barred from asserting rights that might otherwise have existed against the other party who, in good faith, relied upon such conduct and has been thereby led to change his or her position for the worse. To establish equitable estoppel, the party claiming estoppel must demonstrate that: (1) the other person misrepresented or concealed material facts; (2) the other person knew at the time he or she made the representations that they were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other person intended or reasonably expected that the party claiming estoppel would act upon the representations; (5) the party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment; and (6) the party claiming estoppel would be prejudiced by his or her reliance on the representations if the other person is permitted to deny the truth thereof." *Geddes v. Mill Creek Country Club, Inc.*, 751 N.E.2d 1150, 1157 (Ill. 2001) (citations omitted). Estoppel may arise from silence as well as words. *Id.* The party claiming estoppel has the burden of proving it by "clear and unequivocal evidence." *Id; Steinmetz v. Wolgamot*, 995 N.E.2d 338, 349 (Ill. App. Ct. 2013).

In response to Kenny's February 2012 motion for partial summary judgment, Central asserted that it needed to conduct discovery to support its argument that Kenny "waived" reliance on the "necessarily incurred" language of the Subcontract. Central argued that at the February 2009 meeting, Kenny's representatives "specifically directed" Central "to invoice for

*per diems* for all its field labor employees for each day they worked on the project, *regardless of the manner in which [Central] compensated those employees*." (R. 37-1, Aff. of Carl L. Fletcher, Jr. 3 (emphasis added).) The evidence that Central now submits, however, does not bear out the latter part of that assertion. In other words, Central submits no evidence indicating that anyone from Kenny told anyone from Central to bill for *per diem* payments regardless of whether Central was paying its employees *per diems*.

As discussed above, there is evidence that Steve Cvechko stated at the meeting that Central was not "invoicing per diems for people that were local or for people that weren't staying out of town." (R. 79-7, Agreed L.R. 56.1 Stmt., Ex. F, Steve Cvechko Dep. 71.) Central also submits evidence that James Buckner of Kenny stated that Central should bill Kenny for *per diem* payments for anyone who was working on the Project. (R. 104, Kenny's Resp. to Central's L.R. 56.1 Stmt. ¶ 49; R. 79-7, Agreed L.R. 56.1 Stmt., Ex. F, Steve Cvechko Dep. 71.) Brent Cvechko testified that Buckner made this statement and explained, "because you're incurring expenses." (R. 95-1, Central's L.R. 56.1 Stmt., Ex. O, Dep. of Brent Cvechko 51-52.) Central submits the affidavit of Steve Cvechko, who states that Buckner also told him that "there is plenty of money on this job, so bill what your contract allows." (R. 109-10, Central's L.R. 56.1 Stmt. of Add'l Facts, Ex. I, Steve Cvechko Aff. ¶ 2b.) Troy Sampson testified that Buckner stated that Central should bill a *per diem* for every employee on the Project in accordance with the allowance in the Subcontract. (R. 97-1, Central's L.R. 56.1 Stmt., Ex. S, Dep. of Troy Sampson 47-48.) According to Steve Cvechko, after the February 2009 meeting, Central billed Kenny for *per diems* "for every person every day that [they were] on the job because we had a

per diem allowance in B-1.1 that said we could." (R. 79-7, Agreed L.R. 56.1 Stmt., Ex. F, Steve Cvechko Dep. 53.)

Notably missing from Central's submissions is any evidence that Kenny told Central at the February 2009 meeting (or at any point) to bill for *per diems* without regard to whether Central was incurring those expenses or paying them through to its employees. In fact, Central's president, Steve Cvechko, admitted at his deposition that he "never had any discussion until much later at the audit[15] about Kenny discovering that [Central] hadn't paid th[e] *per diems* to the field men." (*Id.* 71-72.) Aside from Central's explanation for the "spent the night" notations on production reports, there is no evidence that the parties discussed Central's policy of not paying *per diems* or what Central intended to do in the future with respect to paying its employees *per diems*. Whether Central was incurring expenses for *per diems* was simply not the focus of the February 2009 meeting.

Central has failed to submit evidence that even raises a genuine issue regarding estoppel, much less entitles it to summary judgment. Central fails to develop its estoppel argument by tying its complaints about Kenny's conduct to the specific elements of estoppel. It does not identify any misrepresentations or omissions by Kenny upon which it reasonably relied. Central maintains that Kenny "misrepresented the per diem allowance provision" (R. 90, Central's Mem. in Supp. of Mot. for Summ. J. at 10) but fails to submit any evidence that Kenny represented that Central could bill for *per diems* without having incurred those expenses or that Kenny was aware that Central would not be incurring such expenses going forward from the February 2009 meeting. Accordingly, Central's estoppel argument is rejected.

---

[15]The audit occurred in spring 2011.

The Subcontract unambiguously requires that to be payable by Kenny, *per diem* payments must be costs that are "necessarily incurred" by Central. To "incur" a cost, one must become liable for it. It is undisputed that Central's policy was not to take upon itself liability for *per diems* to field laborers; therefore, it did not "incur" those *per diem* costs. Accordingly, the Court denies Central's motion for partial summary judgment on this issue and grants Kenny's motion for partial summary judgment.

## D.     Payments for Wage Increases

Central moves for summary judgment as to whether it was entitled to the increased payments it received on October 1, 2008 based on wage increases for field laborers. Like the *per diem* issue, this issue is governed by the definition of the "Cost of the Work." The Subcontract provides that Kenny would pay Central for the "Cost of the Work." (R. 79-1, Agreed L.R. 56.1 Stmt., Ex. A, Subcontract at 8 ¶ 6.1.) The Cost-Plus Addendum to the Subcontract states that the "Cost of the Work" means "costs necessarily incurred by [Central]," which includes "[t]he cost of field labor directly employed by [Central] during performance of the Work at the hourly rates attached hereto as Exhibit B-1.1." (*Id.*, Ex. B-1.) Exhibit B-1.1 to the Cost-Plus Addendum is a chart titled "Field Labor Rates Central Contracting, Inc. January 1, 2007 to December 31, 2007." It lists five "wage classification" jobs, including "Equipment Operator" and "Laborer," and the corresponding hourly wage rate and overtime rate. There are five "notes" under the chart, the second of which provides that "Per Diem shall be paid in accordance with IRS Publication 1542, Per Diem." Note 3 provides: "Field labor rates include a multiplier of 1.7293 and are inclusive of Subcontractor's Fee." Note 5 provides: "Rates may be adjusted annually based on changes in the salaries or wages of Subcontractor's employees; provided, however that (a) any such annual

increase will be limited to four percent (4%[)] in the aggregate, for individuals working on a full time basis on the Project; and (b) any such annual increases for other Subcontractor's employees shall be limited to four percent (4%)." (*Id.*, Ex. B-1.1.)

Central asserts that it is entitled to the increased payments for wage increases because the Subcontract does not contain a prerequisite that it have full-time laborers on the Project on the date of the anniversary of the Subcontract. (R. 90, Central's Mem. in Supp. of Mot. for Summ. J. at 12-13.)[16] Kenny responds that Central's argument neglects the real issue, which is whether Central "incurred" the expenses for the wage increases. According to Kenny, "Central must provide evidence that the 4% increase request is a result of Central actually incurring costs 4% in excess of the base wages in Exhibit B-1.1." (R. 103, Kenny's Resp. to Central's Mot. at 12.) The base wages for the field laborers, according to Kenny, "can be calculated by dividing the billable rates noted in [the] Subcontract by the 1.7293 multiplier in note 3." (*Id.*) Kenny lists the allowed pre-increase base wages in its memorandum and in an affidavit from Terry Jebavy, its business manager for the Project. (*Id.* at 12-13; R. 106, Aff. of Terry Jebavy ¶¶ 7.) Jebavy, who supervised Kenny's audit at the conclusion of the Project, states that the audit revealed that the fourteen employees at issue either did not receive raises or received raises only to the contractual base wage that Central was already receiving under the Subcontract. (R. 106, Jebavy Aff. ¶¶ 8, 10-12.) In other words, Central was not paying the base wage rate to these employees before the 2008 increase, so it did not incur any additional costs when it gave some of those employees

---

[16]Central argues alternatively that Kenny should be estopped from asserting its objections to the increased payments for wage increases because Kenny initially approved and paid the wage rate increases and did not raise its objection until much later. (Central's Mem. in Supp. of Mot. for Summ. J. at 13-15.) Central fails to develop this argument by discussing the elements of estoppel or identifying any alleged misrepresentation by Kenny.

raises that did not exceed that base wage rate. Kenny also points out that "Central was not in fact paying its employees any increased wage on October 1, 2008 because none of the submitted employees were working" on the Project as of that date. (R. 103, Kenny's Resp. to Central's Mot. for Summ. J. at 14.)

In reply, Central reiterates its argument that what it paid its employees is irrelevant "because this is a T[ime] & M[aterials] contract." (R. 112, Central's Reply at 12.) The Court has rejected that argument. Central also asserts that "Kenny cannot now, in its Response, challenge for the first time its own determinations, previously made and accepted." (*Id.* at 13.) But this is not the first time Kenny has raised the argument; it is explicitly asserted in the Counterclaim. (R. 28, Countercl. ¶ 19.) Central also maintains that when one compares its employees' actual wages before and after the increase using Kenny's own chart, "it is evident that in the aggregate, Central increased its employees' wages more than 4%." (R. 112, Central's Reply at 14.) This argument ignores the requirement that an expense be "incurred" to be payable.

The Court agrees with Central, however, that the Subcontract's provision regarding wage increases does not require Central's full-time employees to have been working on October 1, 2008 in order to have triggered a corresponding increase in payments from Kenny. The provision states that the wage rates "may be adjusted annually" and requires that an individual be working full-time on the Project to trigger Central's eligibility for a corresponding four percent increase in payments from Kenny. It does not require Central to request the increase on any particular date or that an employee be working full-time on any particular date. (There is still the requirement that the cost have been "incurred," though, so to the extent that Central contends

22

that it should have received an increase in payments on October 1, 2008 for an employee who did not receive a qualifying increase until November 1, 2008 or thereafter, the contention is rejected. Kenny's liability for an increase in payments would begin at the time the qualifying raise went into effect.)

Mr. Jebavy's affidavit raises a genuine issue of material fact as to whether Central incurred any costs in relation to the wage increases. Therefore, Central's motion for partial summary judgment must be denied.

## CONCLUSION

The motion of plaintiff/counterdefendant, Central Contracting, Inc. ("Central"), for partial summary judgment [88] is denied. The motion of defendant/counterplaintiff Kenny Construction Company ("Kenny") for partial summary judgment [78] is granted.

A status hearing is set for March 18, 2015 at 9:30 a.m. The parties are directed to meet and confer prior to the status hearing to discuss the prospect of settlement.


**SO ORDERED.**                                   **ENTERED:   February 25, 2015**


_____
**HON. JORGE L. ALONSO**
**United States District Judge**